## CITY OF AMARILLO v. WARE.
### No. 3443.

Court of Civil Appeals of Texas. Amarillo.
Sept. 16, 1931.

Rehearing Denied Sept. 30, 1931.

Underwood, Johnson, Dooley & Simpson and Vance Huff, all of Amarillo, for appellant.

Works & Bassett, of Amarillo, for appellee.

RANDOLPH, J.

On September 15, 1930, the above case pending on appeal in this court, was certified to the honorable Supreme Court of Texas for their answers to four questions propounded by us to them for our guidance. The questions were referred by the Supreme Court to the Commission of Appeals for their answers to same, and that court answered three of the questions propounded by us, but declined to answer the fourth categorically "Yes" or "No." 40 S.W.(2d) 57, 62.

By referring to the published answers, it will be seen that the Commission, while declining to answer question No. 4 categorical-ly, did discuss at some length rules which that court evidently considered as a sufficient reply to said fourth question. Hence, accepting such discussion as an answer to our fourth question, we will proceed to decide the matter of law involved in such question as we interpret their answer to same.

The Commission of Appeals, in discussing the fourth question, said:

"In answer to the fourth question, the record discloses that the plaintiff, having sued for the permanent injury to his land, was entitled to recover as the true measure of his damages claimed the difference in the value of the land immediately before and immediately after the injury. In addition to the damages sustained to his land, he was entitled to recover as a measure of damages to his then growing crops thereon the difference between the value of the crop just before and just after the damage. This rule has been so well discussed and the authorities bearing thereon reviewed in the case of Raywood Rice Canal & Milling Co. v. Langford Bros., 32 Tex. Civ. App. 401, 74 S. W. 926, 928, (Writ Ref.), we quote from the opinion as follows:

" 'The measure of damages in such a case is stated to be the difference between the value of the crop just before and just after the damage. In speaking of the value of the growing crop at the time of the injury, of course was meant its value for the purpose of continuing its cultivation to maturity, for in most, if not all, cases, it would be valueless for any other purpose. In ascertaining its value, proof must be heard either as to the market price or its intrinsic worth, and it follows that any witness who undertakes to speak intelligently as to its value must base his figures upon a sound estimate of what the crop would probably produce if well cultivated and uninjured, and to deduct from that result the cost of cultivation and marketing.'

"It is further said: 'In Ry. Co. v. Pape, 73 Tex. 503, 11 S. W. 526, Justice Gaines, in a case involving damage to a growing crop, after stating the rule in substance as above, and remarking upon the fact that usually there would be no market for such a thing, uses the following language: "It follows that in such a case some other method must be resorted to for the purposes of ascertaining its value. It seems to us that, as a general rule, the most satisfactory means of arriving at the value of growing crops is to prove its probable yield under proper cultivation, the value of such yield when matured and ready for sale, and also the expense of such cultivation, as well as the cost of its preparation and transmission to market. The difference between the value of the probable crop in the market, and the expense of maturing, preparing, and placing it there, will in most cases give the value of the growing crop with as much certainty

as can be attained by any other method." It is apparent from the language quoted that our Supreme Court has taken into consideration and adopted the methods which the ordinary witness as to value will naturally and logically employ in speaking to the value of a growing crop, and thus the court is indirectly influenced and controlled in such an inquiry by the estimated yield. The following Texas cases have followed the rule as stated: Ry. Co. v. Borsky, 2 Tex. Civ. App. 545, 21 S. W. 1011; Ry. Co. v. Simonton, 2 Tex. Civ. App. 558, 22 S. W. 285; Ry. Co. v. McGowan, 73 Tex. 355, 11 S. W. 336; Ry. Co. v. Pape, 73 Tex. 501, 11 S. W. 526; Ry. Co. v. Joachimi, 58 Tex. 456.' See Ry. Co. v. Schofield [72 Tex. 496, 10 S. W. 575], supra; F. W. & N. O. Ry. Co. v. Wallace, 74 Tex. 581, 12 S. W. 227."

■ We therefore hold that, as the judgment of the trial court only permitted a recovery of crop damage for the year 1928, the crop destroyed at the time the permanent injury was inflicted on the land, the trial court properly admitted the evidence of the value of that crop destroyed.

There was no objection made to the excess of the judgment rendered by the trial court in such a way as to properly present that question for our review, and hence we do not consider same.

We therefore affirm the judgment of the trial court.

On Motion for Rehearing.

This case was originally submitted and argued on September 10, 1930. After the submission and argument, this court certified four questions to the Supreme Court for answer. Three of the questions were answered, but the court refused to answer the fourth question categorically "Yes" or "No." On the return of the certificate with the answers of the Commission of Appeals, it occurred to the writer of this opinion that this court would like to hear argument upon the discussion of the Commission of Appeals of the fourth question submitted to the Supreme Court. For that reason on August 23, 1931, we set the case down for resubmission on September 9, 1931. In order that there might be no misunderstanding of the purpose of the hearing and that notice might duly be given to opposing counsel so that they might be present, the court called attention of the clerk to the order made by us and directed him to call each of the opposing firms over the phone and notify them of the setting with the request for reargument. In the presence of the writer, the clerk called the office of each of these firms and informed them on that day, August 23, 1931, that the case was set for submission and reargument on September 9, 1931.

In addition to this, the clerk of this court issued and mailed to each of the opposing firms the customary written notice of the order setting the case for resubmission and reargument on September 9, 1931.

Mr. Bassett, of the firm of Works & Bassett, appeared at our request and presented a brief argument, and informed the court that the attorney for appellant had informed him the evening before that he could not appear in court because he was then leaving for the city of Lubbock.

This court has a rule never to permit oral arguments on motions for rehearing and not to permit arguments at all in such cases except upon the original submission. As stated, the original submission of this case was on September 10, 1930, when counsel for both parties were present and argued the case fully before this court. The request for reargument was an invitation from this court to assist in enlightening the court upon one phase of the answers to our questions, and was not only for the benefit of this court, but for the benefit and as a courtesy to both counsel in the case.

We have before us a motion by one of the junior members of the firm representing the appellant, in which he requests this court to grant the plaintiff permission to present oral argument when this motion for rehearing is submitted in this court. This we have declined to do, and have overruled his motion, for the reason that we have devoted more time to this case than the questions involved required and that each of these counsel have had an abundant time in which "to have their day in court" and no injury has been done by us to said counsel in refusing to permit further oral argument.

The appellant calls our attention to the fact that neither this court nor the Commission of Appeals has passed upon the assignment of error in which error is claimed on the part of the trial court in failing to sustain defendant's exception to plaintiff's petition because said petition shows that the plaintiff had conveyed his title to the land damaged and is restricted to a recovery of those items of damage for loss of crop; the petition failing to show that he received a less sum than he would have received but for the construction of the storm sewer. We concede that we overlooked this assignment. Also, as we did not include this question in our certificate to the Supreme Court, same was not decided by the Commission of Appeals.

The plaintiff pleads his cause of action at great length, pleads his ownership of the land upon which he claims the permanent damage was inflicted, and alleges: "That after the accrual of all of said damages and the permanent depreciation of his property, as shown above, plaintiff on or about the 10th day of November, 1929, traded and disposed of said above described land in its then condition, but without in any wise conveying or disposing of

his said cause of action on account of the damages hereinbefore shown, said land having been so injured and depreciated in value before his said conveyance thereof and he being entitled to recover said full damages claimed on account of said injuries and their permanent nature, all of which accrued prior to said conveyance and which conveyance was only of said depreciated value."

Supporting this pleading, we quote evidence from the testimony of plaintiff, Ware, as follows:

"I traded and disposed of my land in November of last year, and the deed that I gave recites that I received $13,500 for it. I traded the land. As to why I recited the consideration in the deed of $13,500 when I didn't consider I was getting $13,500, there has got to be something stipulated in a deed. and it was Mr. Henson's suggestion. It didn't make any difference what the valuation was if we could agree on a trade; that was immaterial, only to satisfy him and to go on record. That is what it was put in for.

"I was not advised that if I recited a consideration above what I was actually getting that it would add to my income tax, for that is not bothering me at all. Nobody advised me about my excess profit tax. I didn't take that into consideration, and didn't even think about it; I just wrote the $13,500 consideration in the deed. In a way, both of us suggested that figure of $13,500. As to what I actually got, I don't know whether I got anything or not; I got a deed, and, of course, I think I got something or I wouldn't have traded, naturally. I got a piece of land in the trade, 986 acres in Donley County, Texas. I assumed a debt of $11,250 against the Donley County land. I just merely traded my place for his equity in the 986 acres. * * *

"I did not pay a commission on a valuation of $15,000. I paid a commission on a valuation of $13,500; in other words, I paid a 2½% commission on a valuation of $13,500. As to my swearing here that I was only getting $5,-000 or $6,000, you can take that any way you want it. I did not testify to Judge Works on my direct examination that I considered I was only getting for my place $5,000 or $6,-000. As to what I say was the real value that I did get for my place, that has got to be determined later, because I don't really know. As I sit here now, I don't estimate the actual value of my place. I don't know whether one dollar or one million dollars. I could very easily lose the place I got, of course, I could have lost this place out here, and I had a pretty good chance to. I mean, that I could lose this down here if I didn't pay the debts I assumed against it. As to what I considered his equity in his place down there, the place figured $24,650, and there was $8,150 Federal Loan against it. I took it in at $24,650, and I figured that his equity in it was about $16,-

000; then, I owe him, personally, $3,200. I mean by that, that I gave notes back against it—I gave him vendor's lien notes back against it for $3,200. That makes $11,000, and $11,500 from the $24,650 leaves $13,500. That is where I get the $13,500 consideration for the place. In other words, I thought that I was getting his equity worth $13,500 for my place, whether it was so or not, and that is where I get the $13,500 I recited in my deed.

"I don't know that his equity in his place was worth to me $13,500, but I thought so; but I don't know it. I did think so, unless I lose the place by letting it foreclose, unless I let the debt I assumed be foreclosed, but that is to be determined later. In a way, I got everything I expected to get unless I let it be taken away from me for non-payment of the debt I assumed; but the place may not determine what I expected it to be. I thought naturally from looking at it that the equity was worth $13,500, or I wouldn't have traded for it. If I didn't believe and think that I had an equity, after my investigation, to be worth $13,500 I wouldn't have traded for it; I had to take it in at something.

"If my place has been damaged $10,000, and it was originally worth $16,000 as I have stated, I knew when I traded with Henson that $10,000 of that value on my place was gone. I didn't tell him about those floods, and what damage had been done to me, simply because he didn't ask me, and I didn't volunteer to tell him. I just naturally kept that information to myself. In other words, I got $13,500 for what I considered was worth $6,-000. That is, in a trade. Naturally, I wanted to make as good a trade as I could.

"As to whether I want to change my testimony on that part now from the way I gave it yesterday—I didn't tell you I considered that the cash valuation; and I am not changing my testimony now. If I told you in that way, you understood it that way; it wasn't my intention. I want to change the meaning of my testimony from the way I gave it yesterday and the way you expressed it. I am wanting to change the meaning of what I meant. I might want to change the meaning of some of the words I used yesterday. I want to change the meaning of the words I used yesterday simply because I didn't put it in the words the way I recollected it. I don't understand lots of these big words that you fellows use. The word, 'equity' is plain enough and I understand what is meant by that. I told you how I arrived at the $13,500.-00 recited in my deed yesterday. As to my saying that I figured this man's land at $25.-00 an acre—that is what he was holding it at in a trade, and it came to about $24,500. And I said that he had an $8,000 Federal Loan against it and that I gave him note that in addition to assuming his Federal Loan, so as to come to where his equity was $13,500.00

and that is what I wrote in my deed; that is what the deed shows. I don't know that I am getting $13,500.00 equity in his land. I don't think that I swore to you yesterday repeatedly that, 'If I had not thought I was getting $13,500 for my place, represented by his equity in that land, I would not have traded.' I didn't say anything like that. If I did use that language it was not true for I didn't think it was worth it then, and I don't think it is worth it now. If I used that language, I didn't mean it that way. You must remember that I was on the stand over four hours yesterday and was drilled very hard; I am an ordinary person and you can get me crossed on some of my words.

"My story is now, to make a long story short, that I puffed up the value of my place $13,500 so as to keep from giving him so much difference between the Federal Loan and mine; in other words, I figured that he had puffed the value of his place, and I puffed the value of mine to correspond with his value, because I thought he was exaggerating the value of his, and I still do. I am not still exaggerating the value of my land. I didn't just say that; I said I thought he was; I wanted to make it as big as I could. * * *

"The Donley County land was estimated at $25.00 per acre. It is hard to determine what the actual or real value of the equity I got in the Donley County land for my property, which was clear, was, since I have investigated it, I can't say I can estimate that, not the real valuation. * * *

"When I was asked on cross-examination in regard to this land out here in the way I figured it, when I was asked about putting the land in at $13,500 and how came it to be figured that way and I answered 'In a way,' I meant to cut down as much between that and the Federal Loan as possible; in other words, I meant to get as big a trade out of him as I could."

Witness J. B. Martin testified that the land traded to Ware in exchange for the sixteen acres owned by him was of the market value of $17.50 per acre. The witness Henson testified that the reasonable value of the sixteen-acre tract traded by Ware for the Donley county land in August, 1929, was $7,500. This was before the trade by Ware but after the damage was inflicted.

■ It is clear that Ware was not bound by the recitals in the deed as to the value of his sixteen acres, and he makes it clear that he was not intending to place that estimate as his consideration of its real value.

■■ The trial judge's findings necessary to warrant the judgment rendered by him cannot be set aside by us, because there is evidence to support it.

We quote from the following decisions cited by the appellee:

"Upon an appeal or writ of error every reasonable presumption will be indulged in favor of the findings of the trial court, even where no findings of fact and conclusions were filed by the Court, or requested by either party. Moreover, any doubts as to the facts raised by the evidence, and any view of the law which the Court could have applied under the pleadings and evidence, will be resolved in support of the judgment." 5 Tex. Jur. § 747.

"The objections would be worth nothing if there had been a jury, and certainly they cannot be entertained where the cause was tried by the judge, and the presumption prevails that he gave weight to legal testimony alone, of which there was amply sufficient, in rendering his judgment." Barreda v. Milmo Nat. Bank (Tex. Civ. App.) 241 S. W. 743, 746; Hogg v. Sinclair Oil & Gas Co. (Tex. Civ. App.) 38 S.W.(2d) 886.

We are of the opinion that there is no reversible error in the proceedings in the district court as presented to us, and therefore overrule appellant's motion for rehearing, and affirm the judgment of the trial court.